IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

HC OPERATING, LP, ET AL.       §
                                      §

     *Plaintiffs,*               §
                                        §

v.                                     §        Civil Action No. 3:19-cv-02425-S
                                        §

ATLAS APARTMENTS       §
ACQUISITION, LLC and STEVEN   §
IVANKOVICH,                 §
                                        §

     *Defendants.*           §

### PLAINTIFFS' FIRST AMENDED COMPLAINT

NOW COME HC Operating, LP, Huffines Retail Partners, LP, The Haley Angelica Huffines 1995 Trust dated October 26, 1995 a/k/a the Haley Angelica Huffines 1995 Children's Trust, The Garrett James Huffines 1995 Trust dated October 26, 1995 a/k/a the Garrett James Huffines 1995 Children's Trust, The Hayden Hartwell Huffines 1995 Trust dated October 26, 1995 a/k/a the Hayden Hartwell Huffines 1995 Children's Trust, The Donald B. Huffines 1996 Children's Investment Trust dated May 10, 1996, Huffines Plano Properties, LP, The Phillip W. and Holly A. Huffines 2011 Children's Trust f/b/o Haley Angelica Huffines u/a/d August 23, 2011, The Phillip W. and Holly A. Huffines 2011 Children's Trust f/b/o Garrett James Huffines u/a/d August 23, 2011, The Phillip W. and Holly A. Huffines 2011 Children's Trust f/b/o Hayden Hartwell Huffines u/a/d August 23, 2011, Riverside DPH, LP, HC Operating, LP, The Phillip Huffines 1996 Trust u/a/d June 26, 1996 a/k/a The Phillip Huffines 1996 Trust, HC Harmony Hill Manager, Inc., and Benbrook Winchester, LP (collectively the "Sellers" or "Plaintiffs") and file this their First Amended Complaint seeking damages for breach of contract

against Atlas Apartment Acquisition, LLC ("Atlas" or "Purchaser") and Steve Ivankovich ("Ivankovich" or "Guarantor") and in support thereof respectfully show as follows:

## I.
## JURISDICTION AND VENUE

1.      The Court has jurisdiction over this matter pursuant to 28 U.S.C. §1332 because the matter in controversy and the amount of the dispute exceeds seventy-five thousand dollars ($75,000), exclusive of interest and costs, and is between citizens of different States.  Venue is proper before this Court pursuant to 28 U.S.C. §1391(b)(2) because a substantial part of the events or omissions giving rise to the claim occurred, and a substantial part of the property that is the subject of the action is situated, in Dallas County, Texas.

## II.
## PARTIES

2.      HC Operating, LP, is a limited partnership formed by and under the laws of the State of Texas with its principal place of business in Dallas County, Texas.

3.      Huffines Retail Partners, LP, is a limited partnership formed by and under the laws of the State of Texas with its principal place of business in Dallas County, Texas.

4.      The Haley Angelica Huffines 2019 Trust dated February 19, 2019 (as successor in interest to the Haley Angelica Huffines 1995 Trust dated October 26, 1995 a/k/a the Haley Angelica Huffines 1995 Children's Trust) is a trust formed by and under the laws of the State of Texas with its principal place of business in Dallas County, Texas.

5.      The Garrett James Huffines 2019 Trust dated February 19, 2019 (as successor in interest to the Garrett James Huffines 1995 Trust dated October 26, 1995 a/k/a the Garrett James Huffines 1995 Children's Trust) is a trust formed by and under the laws of the State of Texas with its principal place of business in Dallas County, Texas.

6.     The Hayden Hartwell Huffines 2019 Trust dated February 19, 2019 (as successor in interest to the Hayden Hartwell Huffines 1995 Trust dated October 26, 1995 a/k/a the Hayden Hartwell Huffines 1995 Children's Trust) is a trust formed by and under the laws of the State of Texas with its principal place of business in Dallas County, Texas.

7.     The Colin 1996 Investment Trust u/a/d May 10, 1996 (as successor in interest to the Donald B. Huffines 1996 Children's Investment Trust dated May 10, 1996) is a trust formed by and under the laws of the State of Texas with its principal place of business in Dallas County, Texas.

8.     The Devin 1996 Investment Trust u/a/d May 10, 1996 (as successor in interest to the Donald B. Huffines 1996 Children's Investment Trust dated May 10, 1996) is a trust formed by and under the laws of the State of Texas with its principal place of business in Dallas County, Texas.

9.     The Dierdre 1996 Investment Trust u/a/d May 10, 1996 (as successor in interest to the Donald B. Huffines 1996 Children's Investment Trust dated May 10, 1996) is a trust formed by and under the laws of the State of Texas with its principal place of business in Dallas County, Texas.

10.    The Russell 1996 Investment Trust u/a/d May 10, 1996 (as successor in interest to the Donald B. Huffines 1996 Children's Investment Trust dated May 10, 1996) is a trust formed by and under the laws of the State of Texas with its principal place of business in Dallas County, Texas.

11.    The Terence 1996 Investment Trust u/a/d May 10, 1996 (as successor in interest to the Donald B. Huffines 1996 Children's Investment Trust dated May 10, 1996) is a trust

formed by and under the laws of the State of Texas with its principal place of business in Dallas County, Texas.

12.     Huffines Plano Properties, LP, is a limited partnership formed by and under the laws of the State of Texas with its principal place of business in Dallas County, Texas.

13.     The Phillip W. and Holly A. Huffines 2011 Children's Trust f/b/o Haley Angelica Huffines u/a/d August 23, 2011, is a trust formed by and under the laws of the State of Texas with its principal place of business in Dallas County, Texas.

14.     The Phillip W. and Holly A. Huffines 2011 Children's Trust f/b/o Garrett James Huffines u/a/d August 23, 2011, is a trust formed by and under the laws of the State of Texas with its principal place of business in Dallas County, Texas.

15.     The Phillip W. and Holly A. Huffines 2011 Children's Trust f/b/o Hayden Hartwell Huffines u/a/d August 23, 2011, is a trust formed by and under the laws of the State of Texas with its principal place of business in Dallas County, Texas.

16.     Riverside DPH, LP, is a limited partnership formed by and under the laws of the State of Texas with its principal place of business in Dallas County, Texas.

17.     HC Operating, LP, is a limited partnership formed by and under the laws of the State of Texas with its principal place of business in Dallas County, Texas.

18.     The Phillip Huffines 1996 Trust u/a/d June 26, 1996 a/k/a The Phillip Huffines 1996 Trust is a trust formed by and under the laws of the State of Texas with its principal place of business in Dallas County, Texas.

19.     The Donald Huffines 1996 Trust u/a/d June 26, 1996 a/k/a The Donald Huffines 1996 Trust is a trust formed by and under the laws of the State of Texas with its principal place of business in Dallas County, Texas.

20.     HC Harmony Hill Manager, Inc. is a Texas corporation with its principal place of business in Dallas, Texas.

21.     HC LHFJ Wilmer, LP, is a limited partnership formed by and under the laws of the State of Texas with its principal place of business in Dallas County, Texas.

22.     Benbrook Winchester, LP, is a limited partnership formed by and under the laws of the State of Texas with its principal place of business in Dallas County, Texas.

23.     Defendant Atlas is an Illinois limited liability company with its principal place of business in Chicago, Illinois, and has answered and appeared herein.

24.     Ivankovich is an individual residing in Chicago, Illinois, and has answered and appeared herein.

**IV.**
**FACTUAL BACKGROUND**

25.     Sellers are the members of multiple limited liability companies that own, operate, and are developing multi-family housing units known as the Hebron 121 Station apartments in Lewisville, Texas, and the Harmony Hill apartments in Rowlett, Texas.  The members and Sellers of each limited liability company are set forth in Appendix "A" attached hereto.

26.     Purchaser and Sellers entered into multiple agreements whereby Purchaser would acquire all of the membership interests in multiple limited liability companies and, thereby, gain ownership of the Hebron 121 Station and Harmony Hill apartments, which consisted of operating apartment buildings, two ongoing construction projects, and a parcel of undeveloped land.

27.     To accomplish the foregoing transactions, on or about September 17, 2018, Purchaser entered into and executed the following agreements with one or more of the Sellers:

- Membership Interest Purchase Agreement (Phases 1, 2, 3, and 4 – Hebron 121 Station) (hereinafter the "Hebron 1-4 Agreement");

- Membership Interest Purchase Agreement (Phase 5 – Hebron 121 Station) (hereinafter the "Hebron 5 Agreement"); and
- Purchase Agreement (hereinafter the "Hebron 6 Agreement").

28.     Similarly, on October 3, 2018, Purchaser entered into and executed the following additional agreements with one or more of the Sellers:

- Membership Interest Purchase Agreement (Harmony Hill Phase 1) (hereinafter the "Harmony 1 Agreement"); and
- Membership Interest Purchase Agreement (Harmony Hill Phase 2) (hereinafter the "Harmony 2 Agreement").

The Hebron 1-4 Agreement, Hebron 5 Agreement, Hebron 6 Agreement, Harmony 1 Agreement, and Harmony 2 Agreement, are referred to, collectively, as the "Agreements."

29.     Although the Sellers under the Agreements vary, the terms of the various Agreements are very similar.  For example, all of the foregoing transactions were scheduled to close on November 1, 2018 (the "Initial Scheduled Closing Date").  In addition, each of the Agreements required Purchaser to deposit Earnest Money with an Escrow Agent within four (4) business days of the effective date of the respective Agreement.  Each of the Agreements also provided Purchaser with twenty-one (21) days to conduct due diligence ("Due Diligence Period").  At the conclusion of the Due Diligence Period, if Purchaser desired to continue with the purchases, Purchaser had an additional four (4) business days to deposit additional Earnest Money.  Specifically, each of the Agreements originally provided as follows regarding the Earnest Money:

| Contract | Effective Date | Original Earnest Money | Conclusion of Due Diligence | Additional Earnest Money | Total Earnest Money |
|----------|----------------|------------------------|-----------------------------|--------------------------|---------------------|
| Hebron 1-4 | 9/17/2018 | $1,500,000 | 10/8/2018 | $1,500,000 | $3,000,000 |
| Hebron 5 | 9/17/2018 | $100,000 | 10/8/2018 | $400,000 | $500,000 |
| Hebron 6 | 9/17/2018 | $50,000 | 10/8/2018 | $50,000 | $100,000 |
| Harmony 1 | 10/3/2018 | $1,000,000 | 10/24/2018 | $1,000,000 | $2,000,000 |
| Harmony 2 | 10/3/2018 | $100,000 | 10/24/2018 | $400,000 | $500,000 |

30.     Thus, Purchaser had until September 21, 2018 and October 9, 2018 to deposit the original Earnest Money under the Hebron and Harmony Agreements, respectively.   Similarly, Purchaser had until October, 12, 2018, and October 30, 2018, to deposit the additional Earnest Money for the Hebron and Harmony Agreements, respectively.   The failure to deposit the funds would be deemed as Purchaser's decision to terminate the Agreements.

31.     Despite being almost identical, the Hebron 5 and Harmony 2 Agreements differed in some respects from the others.   Hebron 5 and Harmony 2 both involved transfers of projects that were currently under construction and subject to construction loans.   As a result, in those agreements, the Sellers were required to obtain Consents from the construction Lenders before the membership interests could be transferred (the "Consents").

32.     Specifically, Section 4.08 of the Hebron 5 and Harmony 2 Agreements provide that the obligation to grant the ownership interest and Purchaser's obligation to pay the Purchase Price are conditioned on Seller obtaining Consents from the construction lenders to the grant without it being a default under the Construction Loan.   The Consents were required by October 1, 2018 (the "Outside Consent Date").   If the Consents were not obtained by the Outside Consent Date the Agreements provided for an Outside Consent Date Extension to November 1, 2018, and a thirty (30) day extension of the closing.   Section 8.01 of the Agreements also required Seller to provide these Consents at closing.

33.     Purchaser never deposited either the original or the additional Earnest Money and, therefore, as of October 30, 2018, the Agreements were deemed terminated.   Thereafter, Purchaser desired to continue with the transactions and, on January 31, 2019, entered into two (2) Reinstatement and Omnibus Amendments, one for the Hebron Agreements and one for the

Harmony Agreements (collectively, the "Reinstatements").   Among other things, the Reinstatements provided:

- The Outside Consent Date was deemed to be the date ninety (90) days after the deposit of the additional Earnest Money Deposit by Purchaser;

- Neither party was required to begin the process of obtaining the Consents until two (2) days after the deposit by Purchaser of the additional Earnest Money;

- If the Consents were not obtained prior to the Initial Scheduled Closing Date then the Initial Scheduled Closing Date was automatically extended to the Outside Consent Date; and

- An option for a further thirty (30) day extension of the Outside Consent Date and the Closing Date in the event the Consents were not obtained prior to the Outside Consent Date, which could be exercised by sending written notice of the extension *prior to* the Outside Consent Date.

(Hebron Reinstatement, ¶¶ 5 & 7; Harmony Reinstatement, ¶¶ 5 & 6).

34.     In addition, the Reinstatements added a cross-default provision so that a default by the Parties under the Harmony Agreements would constitute a default of the Hebron Agreements as well.  (Hebron Reinstatement, ¶6.  The Harmony Agreements already contained a cross-default provision as to any default under the Hebron Agreements (Harmony Agreements, ¶18.01).

35.     In addition to the Reinstatements, the Agreements were amended an additional twenty-four (24) times.   While a few of these were substantive amendments to various provisions, the majority of the amendments were simply changing dates.  Of particular relevance to this dispute are the twenty-fourth (24th) amendments to the Agreements, which were executed on May 16, 2019.  Among others, the Twenty-Fourth Amendments made the following changes:

- The total Earnest Money Deposit under the Harmony Agreements was $2,500,000.00 (Harmony 24th Amendment, ¶2);

- The total Earnest Money Deposit under the Hebron Agreements was $3,550,000.00 (Hebron 24th Amendment, ¶2);

- The Earnest Money Deposit ($6,050,000.00) could be satisfied by the execution and delivery to Sellers of a personal guaranty by Steven Ivankovich, Purchaser's representative, guaranteeing payment of the Earnest Money Deposit (Harmony and Hebron 24th Amendments, ¶2);

- The Initial Scheduled Closing Date was changed to July 17, 2019 (Harmony and Hebron 24th Amendments, ¶3); and

- The Due Diligence Period was deemed to have expired as of May 16, 2019 (Harmony and Hebron 24th Amendments, ¶4).

36.   On May 16, 2019, Ivankovich executed, and delivered to Sellers, Personal Guaranties of the Earnest Money Deposits required under all the Agreements, satisfying the Earnest Money Deposit requirement.  As a result, per the terms of the Restatements, the Outside Consent Date under the Agreements became August 14, 2019—ninety (90) days after the deposit of the Earnest Money.  By satisfying the Earnest Money Deposit requirement, the obligation to begin the process of obtaining Lenders' Consents was triggered on May 18, 2019—two (2) days later.  (Reinstatements, ¶5).

37.   While the obligation to obtain the Lenders' Consents was an obligation of Sellers under the Agreements, many of the documents and pieces of information necessary to obtain the Consents were in the possession of Purchaser.  For example, legal and regulatory requirements of the Lenders require them to obtain certain information, which only the Purchaser possessed, to satisfy "know your borrower" rules.  To that end, Purchaser was required by the Agreement to assist Sellers in obtaining the Consents.  Specifically, Section 20.05 of the Agreements required Purchaser to "do such things, perform such acts and make, execute, acknowledge and deliver such documents as may be reasonably necessary and customary to complete the transactions contemplated by [the Agreements]."

38.   Unfortunately, despite repeated requests from Sellers and from the Lenders for information reasonably necessary to obtain the Consents, Purchasers failed and refused to

provide sufficient information for Sellers to obtain the Consents by July 17, 2019—the Initial Scheduled Closing Date. As a result, per the terms of the Reinstatements, the Initial Scheduled Closing Date was automatically extended to the Outside Consent Date—August 14, 2019.

39.     On July 30, 2019, Plaintiffs gave notice to Purchaser that Purchaser's failure to provide information and documents reasonably requested by the Lenders was prohibiting Sellers from obtaining the Consents required by the Harmony 2 and Hebron 5 Agreements. Pursuant to the section 18.01 Agreements, Sellers gave Purchasers five (5) days to cure this default.

40.     Purchaser did not cure the aforementioned default. Nonetheless, so that the transactions contemplated by the Agreement could still close on August 14, 2019, Sellers took steps to satisfy their obligation to provide the Consents (or make the Consent no longer necessary) including, but not limited to personal guaranties from the principals of Sellers as well as arranging to use funds from closing to pay off a portion of the construction loans. These steps would not have been necessary had Purchaser cooperated and provided information requested by the Lenders.

41.     As a result of these actions by Sellers, on August 14, 2019—the Initial Scheduled Closing Date—Sellers were ready, willing and able to close. Indeed, Sellers sent executed copies of all documents for the closing to the title company and notified the Purchaser that the documents were prepared and at the title company and demanded that Purchaser close.

42.     Instead of closing, Purchaser sent a notice that it was exercising the Outside Consent Date Extension, purporting to extend the Initial Scheduled Closing Date to September 13, 2019. However, Purchaser's notice was untimely and, therefore, ineffective to extend the Outside Consent Date or the Initial Scheduled Closing Date—such notice had to be sent "***prior to*** the Outside Consent Date." (Hebron 5 and Harmony 2 Agreements, Section 4.08(b)). Purchaser

failed to send written notice prior to the Outside Consent Date and, therefore, did not timely exercise the extension.

43.     Because the Initial Scheduled Closing Date was not extended, closing was required to occur on August 14, 2019. Sellers were ready, willing, and able to close. Purchaser was not.

44.     Even if Purchaser had properly extended the Initial Scheduled Closing Date to September 13, 2019, that date has come and gone and the closing still did not occur. Again, although Purchaser was in default, Sellers were still ready, willing, and able to close on September 13, 2019, Purchaser was not.

## V.
## CAUSES OF ACTION

### COUNT ONE:  BREACH OF CONTRACT

45.     Sellers hereby incorporate paragraphs 1 through 44 the same as if fully set forth verbatim herein.

46.     The transactions could not close on August 14, 2019—the Initial Scheduled Closing Date—absent the Consents.  Despite repeated requests to Purchaser by the Sellers for information required from Purchaser by Lender in order to provide Lender's Consent, including notice of the default and a five (5) day opportunity to cure, Purchaser failed to provide the information and documents required by the Lender to obtain the Consents.

47.     Likewise, Purchaser did not timely extend the Initial Scheduled Closing Date. On August 14, 2019, Sellers were otherwise ready, willing and able to close. However, as a result of Purchaser's actions, the closing did not occur. Purchaser's failures constitute an event of default entitling Sellers to recover the Earnest Money under the Agreements. Purchaser failed and refused, and continues to fail and refuse, to pay the Earnest Money to Sellers. Purchaser's

failure to pay the Earnest Money constitutes a breach of contract that has damaged Sellers in an amount in excess of the Court's minimum jurisdictional limit.

48.     Pleading further and in the alternative, because of Purchaser's failure to cure its default, Sellers' principals gave personal guaranties and took other extraordinary steps, including agreeing to use sale proceeds to pay off construction loans, in order to obtain, or negate the need for, the required Consents.  As a result of these actions, Sellers were ready, willing, and able to close the transactions on August 14, 2019—the Initial Scheduled Closing Date.   Purchaser was not unable to close on August 14, 2019 and failed to timely seek an extension of the Initial Scheduled Closing Date.  Purchaser's failure to close is an event of default under the Agreements entitling Sellers to recover the Earnest Money.  Despite this event of default, Purchaser failed and refused, and continues to fail and refuse, to pay the Earnest Money to Sellers.  Purchaser's failure to pay constitutes a breach of contract that has damaged Sellers in an amount in excess of the Court's minimum jurisdictional limit.

49.     In addition, even assuming the Initial Scheduled Closing Date was extended to September 13, 2019, Purchaser was still unable to close despite Sellers still being ready, willing and able to do so.  Purchaser's continued failures constitute an event of default entitling Sellers to recover the Earnest Money under the Agreements.  Purchaser failed and refused, and continues to fail and refuse, to pay the Earnest Money to Sellers.  Purchaser's failure to pay the Earnest Money constitutes a breach of contract that has damaged Sellers in an amount in excess of the Court's minimum jurisdictional limit.

## COUNT TWO:  BREACH OF GUARANTY

50.     Sellers hereby incorporate paragraphs 1 through 44 the same as if fully set forth verbatim herein.

51.     Ivankovich personally guaranteed payment of Purchaser's Earnest Money in return for Sellers' agreement to further extend the dates in the Agreements and not require the actual deposit of Earnest Money.  As a result of Purchaser's default under the Agreements, the Earnest Money is now payable to Sellers.  Despite notice that the Earnest Money is now due and payable to Sellers, Ivankovich has failed and refused, and continues to fail and refuse, to pay the same.  Ivankovich's refusal to pay Sellers the Earnest Money is a breach of Ivankovich's personal guaranty that has damaged Sellers in an amount in excess of the Court's minimum jurisdictional limit.

## VI.
## ATTORNEYS' FEES

52.     Sellers hereby incorporate paragraphs 1 through 44 the same as if fully set forth verbatim herein.

53.     Despite demand, neither Purchaser nor Ivankovich have satisfied the obligation to pay the Earnest Money to Sellers.  The failure by Defendants to fulfill their obligations required Sellers to retain the undersigned counsel to pursue this matter and agree to pay the undersigned a reasonable fee for all necessary services.  Pursuant to Texas Civil Practice and Remedies Code §38.001, *et seq.*, and the Agreements and the Personal Guaranties, Sellers are entitled to recover its reasonable and necessary attorneys' fees expended pursuing in this matter.

## VII.
## PRAYER

WHEREFORE, PREMISES CONSIDERED, Sellers respectfully requests that upon final hearing, a judgment be entered in favor of Sellers awarding Sellers:

a.      Actual damages;

b.      Prejudgment interest at the maximum permissible rate at law or equity;

c.      Costs of Court;

d.        Reasonable and necessary attorney's fees;

e.        Post-judgment interest on the foregoing sums at the maximum permissible rate at law or equity; and

f.        Such other and further relief to which Plaintiff may show itself entitled.

Respectfully submitted,

*/s/ Richard A. Illmer*
Richard A. Illmer
State Bar No. 10388350
E-Mail: Rick.Illmer@huschblackwell.com
Chad A. Johnson
State Bar No. 24026259
E-Mail: Chad.Johnson@huschblackwell.com

**HUSCH BLACKWELL, LLP**
2001 Ross Ave., Suite 2000
Dallas, TX 75201
Telephone: (214) 999-6100
Facsimile: (214) 999-6170
**ATTORNEYS FOR PLAINTIFFS**

## CERTIFICATE OF SERVICE

I hereby certify that on the 17th of December, 2019, a true and correct copy of the above and foregoing documents was served on all parties electronically or by another manner authorized by the Federal Rules of Civil Procedure and/or via Electronic Service through the Northern District of Texas Electronic Case Filing System (ECF).

*/s/ Chad A. Johnson*
Chad A. Johnson

# Appendix A
## to
## Plaintiffs' Original Petition

| Limited Liability Company | Plaintiff Members/Sellers | LLC Property |
|---|---|---|
| HC Hebron 121 Station 1, LLC | <ul><li>HC Operating, LP</li><li>Huffines Retail Partners, LP</li><li>The Haley Angelica Huffines 2019 Trust Dated February 19, 2019 (as successor in interest to The Haley Angelica Huffines 1995 Trust dated October 26, 1995 a/k/a the Haley Angelica Huffines 1995 Children's Trust)</li><li>The Garrett James Huffines 2019 Trust Dated February 19, 2019 (as successor in interest to The Garrett James Huffines 1995 Trust dated October 26, 1995 a/k/a the Garrett James Huffines 1995 Children's Trust)</li><li>The Hayden Hartwell Huffines 2019 Trust Dated February 19, 2019 (as successor-in-interest to The Hayden Hartwell Huffines 1995 Trust dated October 26, 1995 a/k/a the Hayden Hartwell Huffines 1995 Children's Trust)</li><li>The Colin 1996 Investment Trust U/A/D May 10, 1996 (as successor-in-interest to The Donald B. Huffines 1996 Children's Investment Trust dated May 10, 1996)</li><li>The Devin 1996</li></ul> | Hebron 121 Station, Phase 1 |

| | | |
|---|---|---|
| | Investment Trust U/A/D May 10, 1996 (as successor-in-interest to The Donald B. Huffines 1996 Children's Investment Trust dated May 10, 1996)<br>• The Dierdre 1996 Investment Trust U/A/D May 10, 1996 (as successor-in-interest to The Donald B. Huffines 1996 Children's Investment Trust dated May 10, 1996)<br>• The Russell 1996 Investment Trust U/A/D May 10, 1996 (as successor-in-interest to The Donald B. Huffines 1996 Children's Investment Trust dated May 10, 1996)<br>• The Terence 1996 Investment Trust U/A/D May 10, 1996 (as successor-in-interest to The Donald B. Huffines 1996 Children's Investment Trust dated May 10, 1996) | |
| HC Hebron 121 Station 2, LLC | • HC Operating, LP<br>• Huffines Retail Partners, LP<br>• Huffines Plano Properties, LP | Hebron 121 Station, Phase 2 |
| HC Hebron 121 Station 3, LLC | • HC Operating, LP<br>• Huffines Retail Partners, LP<br>• The Colin 1996 Investment Trust U/A/D May 10, 1996 (as successor-in-interest to The Donald B. Huffines 1996 Children's | Hebron 121 Station, Phase 3 |

Investment Trust dated May 10, 1996)
- The Devin 1996 Investment Trust U/A/D May 10, 1996 (as successor-in-interest to The Donald B. Huffines 1996 Children's Investment Trust dated May 10, 1996)
- The Dierdre 1996 Investment Trust U/A/D May 10, 1996 (as successor-in-interest to The Donald B. Huffines 1996 Children's Investment Trust dated May 10, 1996)
- The Russell 1996 Investment Trust U/A/D May 10, 1996 (as successor-in-interest to The Donald B. Huffines 1996 Children's Investment Trust dated May 10, 1996)
- The Terence 1996 Investment Trust U/A/D May 10, 1996 (as successor-in-interest to The Donald B. Huffines 1996 Children's Investment Trust dated May 10, 1996)
- The Phillip W. and Holly A. Huffines 2011 Children's Trust f/b/o Haley Angelica Huffines u/a/d August 23, 2011
- The Phillip W. and Holly A. Huffines 2011 Children's Trust f/b/o Garrett James Huffines u/a/d August 23, 2011
- The Phillip W. and Holly A. Huffines 2011

| | | |
|---|---|---|
| | Children's Trust f/b/o Hayden Hartwell Huffines u/a/d August 23, 2011<br>• Riverside DPH, LP | |
| HC Hebron 121 Station 4, LLC | • HC Operating, LP<br>• Huffines Retail Partners, LP<br>• The Haley Angelica Huffines 2019 Trust Dated February 19, 2019 (as successor in interest to The Haley Angelica Huffines 1995 Trust dated October 26, 1995 a/k/a the Haley Angelica Huffines 1995 Children's Trust)<br>• The Garrett James Huffines 2019 Trust Dated February 19, 2019 (as successor in interest to The Garrett James Huffines 1995 Trust dated October 26, 1995 a/k/a the Garrett James Huffines 1995 Children's Trust)<br>• The Hayden Hartwell Huffines 2019 Trust Dated February 19, 2019 (as successor-in-interest to The Hayden Hartwell Huffines 1995 Trust dated October 26, 1995 a/k/a the Hayden Hartwell Huffines 1995 Children's Trust)<br>• The Colin 1996 Investment Trust U/A/D May 10, 1996 (as successor-in-interest to The Donald B. Huffines 1996 Children's Investment Trust dated May 10, 1996)<br>• The Devin 1996 Investment Trust U/A/D May 10, 1996 (as | Hebron 121 Station, Phase 4 |

| | | |
|---|---|---|
| | successor-in-interest to The Donald B. Huffines 1996 Children's Investment Trust dated May 10, 1996)<br>• The Dierdre 1996 Investment Trust U/A/D May 10, 1996 (as successor-in-interest to The Donald B. Huffines 1996 Children's Investment Trust dated May 10, 1996)<br>• The Russell 1996 Investment Trust U/A/D May 10, 1996 (as successor-in-interest to The Donald B. Huffines 1996 Children's Investment Trust dated May 10, 1996)<br>• The Terence 1996 Investment Trust U/A/D May 10, 1996 (as successor-in-interest to The Donald B. Huffines 1996 Children's Investment Trust dated May 10, 1996) | |
| HC Hebron 121 Station 5, LLC | • HC Operating, LP<br>• Huffines Retail Partners, LP<br>• The Phillip Huffines 1996 Trust u/a/d June 26, 1996 a/k/a The Phillip Huffines 1996 Trust<br>• The Donald Huffines 1996 Trust u/a/d June 26, 1996 a/k/a The Donald Huffines 1996 Trust<br>• Riverside DPH, LP | Hebron 121 Station, Phase 5 |
| HC Harmony Hill, LLC | • HC Harmony Hill Manager, Inc.<br>• Huffines Retail Partners, | Harmony Hill, Phase 1 |

|  |  |  |
|---|---|---|
|  | LP<br>• The Phillip W. and Holly A. Huffines 2011 Children's Trust f/b/o Haley Angelica Huffines u/a/d August 23, 2011<br>• The Phillip W. and Holly A. Huffines 2011 Children's Trust f/b/o Garrett James Huffines u/a/d August 23, 2011<br>• The Phillip W. and Holly A. Huffines 2011 Children's Trust f/b/o Hayden Hartwell Huffines u/a/d August 23, 2011<br>• The Colin 1996 Investment Trust U/A/D May 10, 1996 (as successor-in-interest to The Donald B. Huffines 1996 Children's Investment Trust dated May 10, 1996)<br>• The Devin 1996 Investment Trust U/A/D May 10, 1996 (as successor-in-interest to The Donald B. Huffines 1996 Children's Investment Trust dated May 10, 1996)<br>• The Dierdre 1996 Investment Trust U/A/D May 10, 1996 (as successor-in-interest to The Donald B. Huffines 1996 Children's Investment Trust dated May 10, 1996)<br>• The Russell 1996 Investment Trust U/A/D May 10, 1996 (as successor-in-interest to The Donald B. Huffines 1996 Children's |  |

| | | |
|---|---|---|
| | Investment Trust dated May 10, 1996)<br>• The Terence 1996 Investment Trust U/A/D May 10, 1996 (as successor-in-interest to The Donald B. Huffines 1996 Children's Investment Trust dated May 10, 1996)<br>• Benbrook Winchester, LP | |
| Harmony Hill Land, LLC | • Benbrook Winchester, LP | Harmony Hill, Phase 2 |

In addition, Riverside DPH, LP and HC LHFJ Wilmer, LP, own certain unimproved real property located near or adjacent to the Hebron 121 Station Apartments, which is known as Hebron 121 Station, Phase 6.